**FORD MOTOR COMPANY,**
Petitioner–Appellant,

v.

**COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.**

No. 94–1956.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 13, 1995.

Decided Dec. 5, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 13, 1996.

John S. Nolan, Mark Lewis Evans (briefed), Alan I. Horowitz (argued and briefed), Miller & Chevalier, Washington, DC, Monika D. Hajek, Loren M. Opper, Ford Motor Co., Office of General Counsel, Dearborn, MI, for petitioner-appellant.

David L. Jordan, I.R.S., Office of Chief Counsel, Washington, DC, Gary R. Allen, Acting Chief (briefed), Richard Farber, Steven W. Parks (argued), U.S. Dept. of Justice, Appellate Section Tax Div., Washington, DC, for respondent-appellee.

Before: ENGEL, MILBURN, and NORRIS, Circuit Judges.

MILBURN, Circuit Judge.

Petitioner Ford Motor Company ("Ford") appeals the decision of the United States Tax Court upholding respondent Commissioner of Internal Revenue's ("Commissioner") reduction of petitioner's deductions for its obligations under agreements it entered into in settlement of tort lawsuits against it. On appeal, the issue is whether respondent Commissioner abused her discretion in determining that petitioner's method of accounting for its structured settlements was not a clear reflection of income under 26 U.S.C. § 446(b)[1] and in ordering petitioner to limit its deduction in 1980 to the cost of the annuity contracts it purchased to fund the settlements. For the reasons that follow, we affirm.

## I.

### A.

Petitioner Ford Motor Company is engaged in a number of businesses, including the manufacture of cars and trucks, and it maintains its books and records and files its income taxes using the accrual method of accounting. In the years preceding 1980, some of Ford's cars and trucks were involved in automobile accidents, and in 1980, Ford entered into 20 structured settlement agreements in settlement of personal injury or accidental death claims with persons who were injured in the accidents and with survivors of persons who died as a result of the accidents. In these structured settlement agreements, Ford agreed to make periodic payments of tort damages, yearly or monthly, in exchange for a release of all claims against it. The payments were to be made over various periods of time, the longest of which was 58 years. All but three of the settlements provided for payments over a period of 40 years or more. The agreements were of three types: (I) those that required petitioner to make periodic payments for a period certain ("Type I settlements"); (II) those that required petitioner to make periodic payments for the remainder of a claimant's life ("Type II settlements"); and (III) those that required petitioner to make periodic payments for the longer of a period certain or the remainder of a claimant's life ("Type III settlements"). In total, the structured settlement agreements provided for payments of $24,477,699.[2]

To provide it with funds to cover the periodic payments, Ford purchased single premium annuity contracts at a cost of $4,424,587. The annuity contracts were structured so that the yearly annuity payments would equal the yearly amount owed to the claimants under the structured settlement agreements. None of the settlement agreements released petitioner from liability following the purchase of the annuity contract, and, in the event of a default on an annuity, petitioner would be required to pay the remaining balance owed to the tort claimants. The parties stipulated that the present value of the deferred payments that petitioner agreed to make to the claimants did not exceed the cost of the annuity contracts. See J.A. 21.

On its 1980 tax return, petitioner claimed deductions for the various types of structured settlements as follows: for the Type I settlements, it claimed the total amount of all periodic payments due; for the Type II settlements, it claimed the amounts it actually paid during 1980; and for the Type III settlements, it claimed the total amount of all payments due for the period certain portion of the settlement. These deductions totaled $10,636,994, which petitioner included as part of a product liability loss that it carried back to its 1970 taxable year pursuant to 26 U.S.C. § 172(b)(1)(I). It also reported the annuity income on its 1980 federal income tax return under 26 U.S.C. § 72. For financial accounting purposes, petitioner reported the 1980 structured settlements by expensing the cost of the annuity in the year of the settlement. For other settlements not funded by annuities, of which there were none in 1980, petitioner expensed the present value of the

---

1. Unless otherwise noted, citations to the United States Code and the Income Tax Regulations are to the Internal Revenue Code of 1954 and the Regulations in effect in 1980, the taxable year at issue in this case.

2. In order to reach this figure, petitioner presumed that the claimants receiving payments for life would survive to their life expectancies.

payments to be made to the claimants in the year of the settlement.

Respondent Commissioner determined that Ford's method of accounting for its structured settlements did not clearly reflect income under 26 U.S.C. § 446(b) and disallowed the deductions petitioner claimed in excess of the cost of the annuities petitioner purchased. Respondent also excluded from petitioner's income the amounts required to be reported as income from annuity contracts, which was $323,340 in 1980. As a result, respondent determined a deficiency in petitioner's 1970 federal income tax liability of $3,300,151.

### B.

Petitioner Ford challenged this deficiency determination by filing a petition in the United States Tax Court. In its amended petition, Ford claimed that it was entitled to deduct in 1980 the full amount of all payments to be made under the structured settlements, basing its valuation of the life settlements on the life expectancies of the claimants. The total deduction Ford claimed was $24,477,699.

The parties submitted the case to the United States Tax Court with all facts fully stipulated. A divided court upheld the Commissioner's position. Based on the tax court's opinion, the parties agreed on a deficiency determination of $2,833,860 under Rule 155 of the Tax Court Rules, and the tax court entered its decision in that amount. This timely appeal followed.

### II.

### A.

Section 446 of the Internal Revenue Code provides the general rule governing use of methods of accounting by taxpayers. Section 446(b) provides that, if the method of accounting used by the taxpayer to compute income does not clearly reflect income, "the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income." 26 U.S.C. § 446(b).[3] The Commissioner has broad discretion under § 446(b) to determine whether a particular method of accounting clearly reflects income. *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 532, 99 S.Ct. 773, 781, 58 L.Ed.2d 785 (1979) (citing *Commissioner v. Hansen,* 360 U.S. 446, 467, 79 S.Ct. 1270, 1282, 3 L.Ed.2d 1360 (1959)). "Since the Commissioner has '[m]uch latitude for discretion,' his interpretation of the statute's clear-reflection standard 'should not be interfered with unless clearly unlawful.'" *Id.* at 532, 99 S.Ct. at 781 (quoting *Lucas v. American Code Co.,* 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930)). Once the Commissioner has determined that a method of accounting does not clearly reflect income, she may substitute a method that, in her opinion, does clearly reflect income.

Petitioner appeals the tax court's holding that respondent correctly determined that petitioner's accrual method of accounting for its tort obligations did not clearly reflect income and its resulting disallowance of a portion of petitioner's deductions for such obligations by imposing a different accounting method on petitioner. All facts in this case were stipulated, and the issue before us is a question of ultimate fact, which we review de novo. *See Walter v. Commissioner,* 753 F.2d 35, 38 (6th Cir.1985); *see also RCA Corp. v. United States,* 664 F.2d 881, 888 (2d Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982).

---

**3.** 26 U.S.C. § 446 provides in relevant part:

(a) *General rule.*—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) *Exceptions.*—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

(c) *Permissible methods.*—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;

(2) an accrual method;

(3) any other method permitted by this chapter; or

(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

## B.

There are three stages to our analysis in this case: first, we decide whether the application of § 446(b) was appropriate; second, we decide whether the tax court correctly determined that petitioner's method of accounting did not clearly reflect income; and third, we address the appropriateness of the method of accounting that the Commissioner imposed in its place.

■ First, petitioner argues that the tax court erred in allowing the Commissioner to require Ford to change its method of accounting because, in the absence of abuse or manipulation, an accrual method taxpayer clearly reflects its income when its reporting satisfies the "all events" test. Therefore, it argues that, because its accrual of deductions satisfied the all events test, the Commissioner had no authority to invoke § 446(b).

■ Ford Motor Company is an accrual method taxpayer. The accrual method of accounting takes income into account when the right to payment is earned, even if payment is not received until later, and expenses into account when they are incurred, even if payment is not made until a later time. Financial accounting systems differ regarding the time that an expense is "incurred" and therefore should be accrued, but, under the tax law, the standard for determining when an expense is "incurred" is the "all events" test. Treas.Reg. § 1.466–1(c)(1)(ii); *United States v. Hughes Properties, Inc.,* 476 U.S. 593, 600, 106 S.Ct. 2092, 2096, 90 L.Ed.2d 569 (1986). This test provides that an accrual method taxpayer must deduct an expense in the taxable year when all the events have occurred that establish the fact of liability giving rise to the deduction and the amount of the liability can be determined with reasonable accuracy. *Id.* The tax court assumed for purposes of discussion that Ford's deductions satisfied the all events test, and for purposes of our review, we will make this assumption as well. *See* J.A. 40.

■ It is a well established principle that the Commissioner may not invoke her authority under § 446(b) to require a taxpayer to change from an accounting method that clearly reflects income, even if she believes that a second method might more clearly reflect income. *Louisville & Nashville R.R. v. Commissioner,* 641 F.2d 435, 438 (6th Cir. 1981). However, we hold that satisfaction of the all events test by an accrual method taxpayer does not preempt the Commissioner's authority under § 446(b) to determine that a taxpayer's method of accounting does not clearly reflect income.

■ Section 446(c) of the Internal Revenue Code provides that, *subject to the provisions of subsections (a) and (b),* a taxpayer may compute taxable income under the accrual method of accounting. 26 U.S.C. § 446(c)(2). The all events test, which is merely a means devised to define the years in which income and deductions accrue, clearly is subordinate to the clear reflection standard contained in subsection (b). The tax court stated:

> The provisions of section 446 make it clear that a taxpayer's ability to use one or more of the methods of accounting listed in 446(c) is contingent upon the satisfaction of subsections 446(a) and (b). The statute does not limit the Commissioner's discretion under section 446(b) by the taxpayer's mere compliance with the methods of accounting generally permitted under section 446(c).... In short, the statute clearly provides that the taxpayers may use an accrual method so long as it clearly reflects income.

J.A. 46. The language of § 446 is clear on its face, and we agree with the tax court's interpretation of the statute. *See Mooney Aircraft, Inc. v. United States,* 420 F.2d 400, 406 (5th Cir.1969) ("The 'all events test,' however, is not the only basis upon which the Commissioner can disallow a deduction. Under 446(b) he has discretion to disallow any accounting method which does not clearly reflect income.").

■ Petitioner argues that Congress acknowledged that the Commissioner's discretion under § 446(b) does not extend to situations such as the present case when it changed the Internal Revenue Code, effective in 1984, to provide in § 461(h)(2)(c) that accrual method taxpayers cannot deduct tort liabilities until the year in which payment is

made.[4] Ford points to the legislative history of § 461, which states that "the rules relating to the time for accrual of a deduction by a taxpayer using the accrual method of accounting should be *changed* to take into account the time value of money." Brief of Petitioner at 22 (citing H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. II [U.S. Code Cong. & Admin. News 1984, 697], at 1254 (1984)) (emphasis added). It argues that this statement indicates a recognition by Congress that the Commissioner was not authorized to deny the sort of accrual that Ford is attempting prior to 1984.

The tax court held that the change in prior law to which the legislative history refers is the all events test contained in the Income Tax Regulations and that Congress did not intend "to limit respondent's authority under section 446(b) in any way by enacting section 461(h) in 1984." J.A. 52. We agree that the change that this passage references is a modification of the all events test and conclude that nothing in the legislative history of § 461(h) limits the Commissioner's authority under § 446(b). Section 461(h) was a Congressional effort to remedy an accounting distortion by placing *all* accrual method taxpayers on the cash method of accounting for tort liabilities, regardless of the length of the payout period and without any consideration of whether accrual of an expense in an earlier year would distort income. Its enactment does not preclude the Commissioner from applying the clear reflection standard of § 446(b) on a case-by-case basis to taxpayers in tax years prior to 1984.

### C.

Having determined that expenses that satisfy the all events test can be disallowed

when accrual would not result in a clear reflection of income, we now examine the correctness of the Commissioner's determination that Ford's method of accounting for its tort obligations did not clearly reflect income. In its opinion, the tax court used an example to "highlight the distortion [of petitioner's income] about which respondent complains." J.A. 36. It utilized the numbers from one settlement agreement under which Ford agreed to pay the claimant $504,000 in 42 equal, annual installments of $12,000. The annuity contract that Ford purchased to fund the payments cost $141,124, demonstrating an implicit rate of return of 8.19 percent. Ford claimed a deduction in 1980 in the amount of $504,000 for this obligation. The tax court used these numbers to create three scenarios, assuming that but for the settlement agreement in question, petitioner would have had taxable income in 1980 of at least $504,000.

In the first scenario, the tax court assumed that the accident in question did not occur and that, as a result, petitioner received an additional $504,000 of currently taxable income. The tax court further assumed that petitioner would have been subject to a 40 percent marginal tax rate, leaving it with $302,400. The tax court then noted that, if the after tax proceeds were invested over 42 years at a rate of 8.19 percent, the $302,400 would grow to $8,249,751.

In the second scenario, the tax court assumed that the accident occurred but that Ford discharged its liability in full by paying and deducting $141,124 and investing the remainder over 42 years. Its current deduction of the $141,124 it paid for the annuity would leave it with $362,876 of taxable income on which it would pay tax of $145,150,

---

**4.** 26 U.S.C. § 461(h) (1986) provides, in relevant part:

(h) *Certain liabilities not incurred before economic performance.*—

 (1) *In general.*—For purposes of this title, in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such items occurs.

 (2) *Time when economic performance occurs.*— Except as provided in regulations prescribed

by the Secretary, the time when economic performance occurs shall be determined under the following principles:

\* \* \*

 (C) *Workers' compensation and tort liabilities of the taxpayer.*—If the liability of the taxpayer requires a payment to another person and—

 (i) arises under any workers compensation act, or

 (ii) arises out of any tort,

economic performance occurs as the payments to such person are made.

leaving $217,726. If it invested the $217,726 over the 42 year period at a 8.19 percent rate of return, it would grow to $5,939,756.

In the third scenario, the tax court assumed that the events occurred as they did in the present case, with Ford deducting the full $504,000 it was required to pay the tort claimants and paying no tax. Investing the $504,000 at a rate of return of 8.19 percent and taking into account the annual payments of $12,000, the tax court found that petitioner would have $9,898,901 remaining after 42 years.

The tax court pointed out that Ford is claiming scenario three treatment and that comparing scenario three to scenario one demonstrates that petitioner is better off with the accidents than if they never occurred. The tax court held that fully deducting payments extending over a long period of time leads to a distortion of income and "the incongruous result that the greater a taxpayer's nominal liability for negligence, the more it benefits." J.A. 38. It therefore concluded that petitioner's method of accounting did not clearly reflect income.

Petitioner challenges the tax court's approval of the Commissioner's determination that its accounting method did not clearly reflect income on several grounds. First, it argues that the tax court's numerical example was flawed by its use of a 8.19 percent rate of return. It asserts that the 8.19 percent rate of return that the tax court found implicit in one of the annuity contracts is a pre-tax rate of return because Ford is required to pay tax on amounts received as an annuity under 26 U.S.C. § 72 and that the tax court instead should have used the after-tax rate of 4.91 percent. Recomputing the investment growth over 42 years using this rate of return in the three scenarios, petitioner asserts that in scenario one it would be $2,267,705; in scenario two it would be $1,632,729; and in scenario three it would be $2,192,446. Thus, petitioner argues: "Ford did not 'fare[ ] better than if the accident never occurred'; the Tax Court's apparent reason for invalidating Ford's tax treatment rests on a misconception." Brief of Petitioner at 35 (quoting Tax Court's opinion at J.A. 38). In her brief, respondent acknowledges

the flaw in the tax court's numerical example and presents an example of her own, arguing that Ford was in a 46 percent tax bracket rather than a 40 percent tax bracket. In respondent's example, petitioner again fares better under scenario three treatment than under scenario one.

Petitioner's brief suggests that the tax court's determination that its accounting method did not clearly reflect income was based solely on the fact that, in the tax court's example, petitioner fared better with the accident than without. We conclude, however, that this factor was not determinative, and that, even viewing petitioner's numerical example as correct, the gross distortion of income that it demonstrates between the economic and tax results persuades us that the tax court's decision was not improper. Given the length of the payment periods, allowing a deduction for the full amount of liability in 1980 could lead to the result that the tax benefit from the deduction would fund the full amounts due in future years and leave petitioner with a profit. Such a result extends the accrual method of accounting beyond its inherent limitations.

█ Our task on appeal is to determine whether there is an adequate basis in law for the Commissioner's conclusion that Ford's method of accounting did not clearly reflect income. *See RCA Corp.,* 664 F.2d at 886. We find several cases from other circuits that support our finding that the Commissioner's exercise of her discretion was proper. First, in *Mooney Aircraft, Inc. v. United States,* 420 F.2d 400 (5th Cir.1969), the Fifth Circuit upheld the Commissioner's denial of the taxpayer's use of an accounting method based on his § 446(b) authority. In that case, Mooney manufactured airplanes, and each purchaser of an airplane received a "Mooney Bond," redeemable for $1000 when the airplane was permanently retired from service. Retirement of the aircraft usually occurred 20 or more years from the date of purchase. Mooney, an accrual method taxpayer, argued that the sale of an aircraft and corresponding issuance of a bond satisfied the all events test for the liability, and, therefore, it attempted to deduct the $1000 redemption price of the bonds in the year of sale. Con-

versely, the government argued that the all events test was not satisfied until the aircraft was retired and that the deduction was improper prior to such time. The Fifth Circuit disagreed with the government, holding that the all events test was satisfied at the time of sale. *Id.* at 405–06. However, it concluded that the taxpayer's method of accounting did not clearly reflect income, emphasizing that the long time period between the deduction for the bonds and their date of redemption was problematic and caused a distortion of income.[5] *Id.* at 409–10.

Furthermore, in *Prabel v. Commissioner*, 882 F.2d 820 (3d Cir.1989), the Third Circuit upheld the Commissioner's discretion under § 446(b) to disallow an accrual method taxpayer's accrual of interest deductions under the "Rule of 78s" method of accounting for its long-term obligations. Under the loan contract terms in *Prabel*, the Rule of 78s was used to allocate payments on a note between principal and interest, causing a portion of the interest accrued in the later years of a 23–year loan to be accrued as deductions in the earlier years of the loan. The court found that the Rule of 78s method, when applied to the financing involved in the case, caused a gross distortion of income and violated the clear reflection standard of § 446(b). *Id.* at 826–28. Likewise in this case, assuming that the all events test for accrual is satisfied, the long time period between the deductions and eventual payment of the obligations causes a distortion of petitioner's income.

■ Petitioner also argues that the tax court's decision that petitioner's method of accounting did not clearly reflect income was improper because it "[a]uthorizes [a]rbitrary and [u]nprincipled [u]se of the Commissioner's [s]ection 446(b) [p]ower." Reply Brief of Petitioner at 3. It asserts that the tax court failed to provide any principles "to delineate the scope of section 446(b)," *id.* at 4, and that, in doing so, it created an "arbitrary

system … that requires all accrual taxpayers to account for their liabilities when they become fixed, yet makes the validity of that reporting method subject to the unconstrained whim of the Commissioner," *id.* at 5–6.

■ We are not persuaded by this policy-based argument. The tax court concluded its opinion stating:

> Finally, we want to make clear that the mere fact that a deduction which accrues prior to the time payment is made (the timing factor) does not, by itself, cause the accrual to run afoul of the clear reflection of income requirement. Inherent in the use of an accrual method is the fact that a deduction may be allowed in advance of payment. Our holding in the instant case is not intended to draw a bright line that can be applied mechanically in other circumstances. We decide only the ultimate question of fact in the instant case; namely, whether, for tax purposes, petitioner's method of accounting for its obligations under the structured settlements clearly reflects income. We hold that it does not and that the Government did not abuse its discretion in making that determination.

J.A. 55. As the tax court observed, "[t]he issue of whether the taxpayer's method of accounting clearly reflects income is a question of fact to be determined on a case-by-case basis." J.A. 35. *See Hamilton Indus., Inc. v. Commissioner*, 97 T.C. 120, 128–29, 1991 WL 138574 (1991) (citing *Peninsula Steel Prods. & Equip. Co. v. Commissioner*, 78 T.C. 1029, 1045, 1982 WL 11111 (1982)). We find the tax court's language sufficient to limit its holding to extreme cases such as this one in which the economic results are grossly different from the tax results and therefore conclude that the tax court's decision does not allow the Commissioner arbitrary or unprincipled discretion.

5. Petitioner argues that *Mooney* is distinguishable on the grounds that the obligations at issue in the case did not satisfy the all events test and that "[t]he case therefore is not good authority for disallowing deductions that clearly satisfy the all events test." Brief of Petitioner at 40. However, the court in *Mooney* clearly stated that it

could not agree with the argument that the all events test was not satisfied. It further held that the time span between incurring and paying the liability made it less probable that the liability would be paid and that this factor was *another reason* for disallowing a current deduction. *Mooney*, 420 F.2d at 410.

### D.

Given that a change was necessary because Ford's accrual of its settlement obligations in 1980 did not clearly reflect income, Ford argues that the method of accounting that the Commissioner imposed in its place was improper. Ford asserts that the Commissioner lacked the authority to impose the method of accounting that she did because it is "inconsistent with the plain dictates of the Code and regulations and the undisputed facts of this case." Brief of Petitioner at 23.

The method of accounting that the Commissioner imposed was to allow Ford a deduction for the amount that it paid for the annuities with no further deductions for the future payments that Ford will make to the claimants. To offset her disallowance of future deductions, the Commissioner will permit Ford to exclude its income from the annuity contracts. Petitioner asserts that this scheme violates established tax law for several reasons and forces Ford to use a tax treatment that it could not have adopted on its own.

 First, petitioner argues that the Commissioner is imposing on it a present value method of accounting which should only be imposed in the presence of a directive by Congress to do so. Ford additionally argues that this method impermissibly allows it only to deduct the approximately $4 million it paid for the annuities without ever allowing a deduction for the additional approximately $20 million it will pay to the claimants and that the Commissioner's method is arbitrary because it is not a method that Ford could have adopted on its own.

Respondent counters that its method of accounting is a modified cash basis method that allows Ford "a dollar for dollar deduction, albeit in the form of an offset against its annuity income, for the full face amount of its future payments of approximately $24 million." Brief of Respondent at 30. Respondent points out that, because she allowed Ford to deduct the full cost of the annuity contracts in 1980, it has no basis in the contracts and would be fully taxable on the annuity income of $24,477,699 as it is received. However, the payments Ford is required to make to the tort claimants, which correspond exactly to the amount of its annuity income, give rise to deductions that offset the income and create a wash. Respondent argues that, because she has relieved taxpayer of the obligation to report the annuity income as it is received, she should not allow Ford any deductions for the required payments.

We find no merit in petitioner's assertion that this methodology is improper because it reduces the amount of the deductions to the present value of the payments petitioner is obligated to make. The Commissioner reduced petitioner's deduction to the cost of the annuity contracts. The stipulated facts provided only that the present value of the payments petitioner is obligated to make *did not exceed* this amount. There is no indication that respondent was imposing a present value method of accounting on petitioner.

 Furthermore, we find no authority that prohibits the tax accounting treatment that the Commissioner and the tax court imposed here. The Commissioner's discretion to impose an alternate method of accounting under § 446(b) is not limited to methods that Ford could have adopted on its own. While we recognize that to require Ford to account for its tort obligations on the cash method might have been a more logical alternative, we cannot find that the Commissioner's exercise of her discretion was arbitrary because it resulted in an accounting treatment more favorable to Ford that a straight cash method would be. The only difference between the Commissioner's method of accounting and the cash basis method is that petitioner receives an immediate deduction for the cost of its annuities rather than recovering that cost over the terms of the annuities under 26 U.S.C. § 72, and this difference inures to Ford's benefit. We therefore conclude that the tax court's decision regarding the accounting method the Commissioner imposed was proper.

### III.

For the reasons stated, the judgment of the tax court is AFFIRMED.